UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PETER PISEK, | ) | |
|        Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-372-RLY-TAB |
| | ) | |
| KINDRED HEALTHCARE, INC. | ) | |
| DISABILITY INSURANCE PLAN, | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, and KINDRED | ) | |
| HEALTHCARE, INC., | ) | |
|        Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction**

This matter is before the court on cross motions for summary judgment filed by

Plaintiff, Peter Pisek ("Plaintiff"), and Defendants, Kindred Healthcare, Inc. Disability

Insurance Plan ("Plan"), Metropolitan Life Insurance Company ("MetLife"), and Kindred

Healthcare, Inc. ("Kindred") (collectively "Defendants").  Plaintiff filed the present

lawsuit against Defendants for alleged violations of the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  The issues before the court on

summary judgment are: (1) whether Plaintiff is entitled to penalties under 29 U.S.C. §

1132(c) for Defendants' failure to provide Plaintiff requested information under 29

U.S.C. § 1024 and § 1133; (2) whether Plaintiff's monthly benefits are to include a cost-

of-living increase under the Plan; and (3) whether Plaintiff is entitled to attorney's fees under 29 U.S.C. § 1132(g).  For the reasons set forth below, the court **GRANTS** in part and **DENIES** in part Plaintiff's motion for summary judgment and **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment.

## II.     Statement of Facts

### Background

1.     Kindred maintains and sponsors an "employee welfare benefit plan," as defined in 29 U.S.C. § 1002(1), for its employees.  (Answer ¶ 9, Docket # 22).  The Plan is an ERISA-governed long-term disability plan.  (Administrative Record ("AR") at 87, 89, Docket # 24).

2.     Kindred is the "plan sponsor" and "plan administrator" pursuant to 29 U.S.C. § 1002(16)(A), (B).  (Answer ¶¶ 3, 4).  The Summary Plan Description ("SPD") designates Kindred as the plan sponsor and administrator.  (AR at 87).

3.     Kindred designated its discretionary authority to determine claims eligibility to MetLife.  (Answer ¶ 5).

4.     Plaintiff is a "participant", as defined in 29 U.S.C. § 1002(7), in the Plan.  (Answer ¶ 11).

5.     As a non-exempt employee of Kindred, Plaintiff purchased a higher amount of optional long-term disability coverage ("LTD Buy-Up coverage") under the Plan.  (Affidavit of Peter Pisek ("Pisek Aff.") at ¶ 1, Docket # 27).  He began contributing toward the premium amount for the LTD Buy-Up coverage in January

2003 and paid the premiums until July 2004, when they were waived under the Plan. (Pisek Aff. at ¶ 1).

6.    Plaintiff began receiving long-term disability benefits on July 1, 2004, due to displacement, lumbar intervertebral. (Answer ¶ 15).

7.    Since that time, Defendants have paid Plaintiff disability benefits every month, although Plaintiff did not receive his monthly check for July 2006 until August 1, 2006. (Supplemental Affidavit of Peter Pisek ("Pisek Supp. Aff.") at ¶ 16, Exhibit to Plaintiff's Reply in Support of Motion for Summary Judgment).

**Plan Details and Definitions**

8.    Under the Plan, the maximum period of disability that the Plan will consider for disabilities due to soft tissue disorders is 24 months from the date the disability starts. (Plaintiff's Documents ("PD") at 1, Docket # 27).[1] However, the 24-month limit does not apply to soft tissue disorders where there is objective evidence of radiculopathies. (PD at 1).

9.    Under the caption "Your Long-Term Disability (LTD) Benefits, What is my LTD coverage amount?", the SPD sets forth the monthly benefit calculation: "LTD Buy-Up coverage pays an additional 20%, for a total of 60% of the first $16,667 in monthly pre-disability earnings, reduced by any other income benefits you may receive due to your disability. The maximum monthly benefit is $10,000 (before

---

[1] The page numbers of Plaintiff's Documents that the court cites correspond to the bate-stamped page numbers on the bottom of those documents. Plaintiff's Affidavit, which was filed with Plaintiff's Documents, is cited by the relevant paragraph number.

any reductions for other income benefits)."  (AR at 73).

10.    Under the same sub-heading, the term "pre-disability earnings" is defined in the

SPD as:

> *Pre-disability earnings* means your base monthly salary or
> wages as of the last day before you became disabled.  Pre-
> disability earnings include any amounts that were deducted
> from your pay on a pre-tax basis for the 401(k) savings plan,
> flexible spending accounts, executive deferred compensation
> arrangements or similar benefits.
>
> Pre-disability earnings do *not* include commissions, bonuses,
> shift differentials, overtime pay, company contributions on
> your behalf to any savings or retirement plan, or any other
> compensation.  (AR at 73).

11.    Under the same heading in the SPD, "Your Long-Term Disability (LTD)

Benefits," but under the subheading, "When do LTD benefits start?", the term

"indexed pre-disability earnings" is explained:

> *Indexed pre-disability earnings* is a measure that takes into
> account inflation and normal growth in salary that would be
> expected to occur from year to year.  The pre-disability
> earnings used in calculating your benefit payments will be
> increased by the annual consumer price index or 7%
> (whichever is less), starting on the 13th monthly LTD
> payment and on the anniversary of that payment for each year
> afterward if you continue to be disabled.  (AR at 74).

12.    Next to that definition, in the left margin of the page of the SPD, the following is

written in bold writing: "If you receive disability payments for more than a year,

the pre-disability earnings figure used to calculate your benefits will be increased

to account for inflation and typical pay increases."  (AR at 74).

4

13.     In the SPD, the term "indexed pre-disability earnings" is used directly above this

definition in the Plan's definition of disability, which is defined as being unable to

earn a percentage of one's indexed pre-disability earnings working either at one's

own or any occupation.  (AR at 74).

14.     "Indexed pre-disability earnings" is also used in the SPD to describe the work

incentive benefit under the sub-heading, "What is the work incentive benefit?"

(AR at 76).  Specifically, the text reads:

> However, following your elimination period, then during the
> next 24 months of your disability, your monthly LTD benefit
> will be reduced so that the total amount you receive from this
> plan, other income benefits and your work earnings will not
> exceed your pre-disability earnings or *indexed pre-disability
> earnings*.

> During the next 24 months of your disability, your monthly
> benefit will be reduced by 50 percent of the amount you earn
> from working while disabled.  In addition, your monthly LTD
> benefit will be further reduced so that the total amount you
> receive from this plan, other income benefits and your work
> earnings will not exceed your *indexed pre-disability earnings*.
> (AR at 76) (emphasis added).

15.     The Plan, as opposed to the SPD, uses the term "indexed pre-disability earnings"

in the same contexts.  (AR at 25, 27).  However, the definition of "indexed pre-

disability earnings" is worded differently.  The Plan states:

> Indexed Predisability Earnings mean your Predisability
> Earnings Increased by the lesser of:

> 1.      the annual rate of increase in the Consumer Price Index
>         (CPI-W) for the prior calendar year; or

5

2.     7%.

The first increase will take place on the date the 13th Monthly Benefit is payable.  Subsequent increases will take effect on each anniversary of the first increase.  You must have been continually receiving Monthly Benefits under This Plan.  (AR at 29).

16.    The Plan is a Kentucky contract and designates that its terms should be interpreted under the laws of that jurisdiction.  (PD at 66).

17.    The SPD states that the claims administrator will respond to the appeal of a denied claim within 45 days, or if needed, the claims administrator may take an additional 45 days.  (AR at 86).  However, if additional time is needed, the claimant will be notified within the initial 45-day time period.  (AR at 86).

18.    The Plan and the SPD specify that the Plan administrators and Plan fiduciaries have discretionary authority to interpret the Plan and determine entitlement to the Plan's benefits.  (AR at 60, 87).  Such interpretations will remain in effect absent a showing that the determination was arbitrary and capricious.  (AR at 60, 87).

**Correspondence between Plaintiff and MetLife and Kindred**

19.     On May 16, 2005, MetLife sent Plaintiff a letter stating that he would only receive disability benefits until June 30, 2006, because his disability, displacement, lumbar intervertebral, did not qualify for an exception to the 24-month benefit period. (PD at 2).

20.    In response, Plaintiff wrote a letter to MetLife dated July 19, 2005, stating that his doctors' notes indicated that radiculopathy was part of his diagnosis and asking

6

MetLife to make a correction in its records.  (PD at 3).

21.    Also in July 2005, Plaintiff received his thirteenth monthly LTD check, but there

was no upward adjustment to reflect a cost-of-living increase.  (Pisek Aff. at ¶ 4).

Pisek sent MetLife a letter dated August 4, 2005, asking it to adjust his monthly

benefit accordingly.  (PD at 4).

22.    By September 2005, Plaintiff had not received a response from MetLife regarding

his disability determination or the cost-of-living increase.  (Pisek Aff. at ¶ 5).  On

September 1, 2005, Plaintiff sent MetLife a letter asking it to respond with its

position on both the 24-month limit to Plaintiff's disability benefits and the

increase in his monthly benefits for cost of living.  (PD at 5).

23.    MetLife responded to Plaintiff's requests by letter dated September 13, 2005.  (PD

at 6).  The letter reiterated the types of disabilities under the Plan that are not

limited to 24 monthly benefit payments, including radiculopathies.  (PD at 6).

However, with respect to Plaintiff's disability, the letter concluded: "At this time,

your diagnosis of Displacement, Lumber Intervertebral would fall under the

limited benefit provision."  (PD at 6).  With respect to the cost-of-living increase,

the letter stated: "As stated in your plan booklet this is considered as 'Indexed pre-

disability earnings [sic]'  This increase would pertain when determining

compensatory wages for employment opportunities in your local economy."  (PD

at 6–7).

24.    On September 20, 2005, Plaintiff sent another letter to MetLife expressing

confusion as to what constitutes objective evidence of radiculopathy that would
exclude his disability from the 24-month benefit limit, since his doctors'
statements indicated that radiculopathy is one of Plaintiff's medical problems.  (PD
at 8).  In that letter, Plaintiff requested a copy of the "Kindred Healthcare, Inc.
Disability Insurance Plan document" that was applicable to his claim.  (PD at 8).
MetLife received his letter on September 23, 2005.  (PD at 8).

25.    On September 21, 2005, Plaintiff sent a letter to Kindred Healthcare, requesting a
copy of the Plan within 30 days as required by ERISA.  (PD at 9).  Plaintiff
specified in his letter that he was not asking for the SPD but rather a copy of the
actual plan document.  (PD at 9).  Kindred received Plaintiff's letter on September
23, 2005.  (PD at 9).

26.    By a letter dated October 7, 2005, MetLife sent Plaintiff a copy of the SPD.  (AR
at 96).

27.    On October 30, 2005, Plaintiff sent a letter to MetLife appealing its determination
that Plaintiff's disability did not qualify for the 24-month exception and again
requesting a cost-of-living increase as provided in the SPD.  (PD at 10–13).
Plaintiff attached relevant doctor's notes to the letter, which detailed his diagnosis.
(PD at 13–36).  MetLife received Plaintiff's letter on November 3, 2005.  (PD at
37).

28.    MetLife sent Plaintiff a letter dated November 8, 2005, acknowledging receipt of
his appeal.  (PD at 38).  The letter stated that MetLife was referring Plaintiff's

claim for an independent review and would respond in writing within 45 days with

its determination, or, if more time was needed, it would take an additional 45 days,

after first notifying Plaintiff of the special circumstances for the delay.  (PD at 38).

29.   After receiving no correspondence from MetLife within the 45 days that it

specified in its November 8, 2005, letter, Plaintiff sent MetLife a letter on

December 28, 2005, 55 days after MetLife received Plaintiff's October 30, 2005,

letter, requesting a determination of his appeal.  (PD at 39).  MetLife received

Plaintiff's letter on December 30, 2005.  (PD at 39).

**Judicial and Administrative Proceedings**

30.   Plaintiff hired an attorney on February 4, 2006, after not receiving a response from

either MetLife or Kindred.  (Pisek Aff. at ¶ 13).

31.   Through his attorney, Plaintiff filed his complaint in the present action on March

6, 2006, alleging that Defendants had violated ERISA by failing to respond to his

appeal, failing to provide him with information he had requested, and wrongfully

denying him benefits under the Plan.  (Complaint ¶¶ 34, 43, Docket # 1).

32.   On May 10, 2006, Plaintiff received a letter from defense counsel dated May 8,

2006, which enclosed a copy of the SPD, the certificate of insurance, and the

underlying group policy.  (PD at 40–80).

33.   The parties jointly filed a motion to stay the litigation in this court to allow

MetLife to render an administrative decision on Plaintiff's claims for continued

LTD benefits and a cost-of-living increase.  (Joint Motion to Stay Proceedings,

Docket # 15).  On May 9, 2006, the court denied the motion as submitted but stayed all proceedings until July 10, 2006, the date of the parties' next pre-trial conference.  (Order on Joint Motion to Stay, Docket # 16).

34.   The parties agreed that Defendants would render a decision no later than July 1, 2006, on whether Plaintiff was entitled to disability benefits longer than 24 months and whether Plaintiff was entitled to a cost-of-living increase.  (PD at 40).

35.   On May 12, 2006, Plaintiff's counsel sent a letter to defense counsel with additional medical documents that evidenced radiculopathy in Plaintiff's condition.  (AR at 97).

36.   Through a letter dated July 5, 2006, MetLife determined that Plaintiff's additional medical information supported the existence of a condition falling within the exception to the 24-month benefit limit; thus, Plaintiff would continue to receive disability benefits as long as he continued to be disabled under the Plan's definition.  (AR at 110).

37.   However, with respect to the cost-of-living increase, the letter stated:

> It appears that you are relying on the SPD in support of this claim.  Typically, the SPD is the controlling document, but because the SPD and the Certificate of Insurance appear to conflict with respect to this Issue, the Certificate of Insurance, the Plan document which provides the funding for the Plan, governs.  See *Health Cost Controls, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999).  Therefore, we must deny your client's claim for additional benefits.  (AR at 111).

38.   Plaintiff appealed this determination through a July 17, 2006, letter written by his

attorney to the claims administrator at MetLife.  (AR at 112).

39.    On September 8, 2006, MetLife again denied the cost-of-living increase.  (AR at
       115).

## III.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Some alleged factual dispute that does not rise to a genuine issue of material fact will not alone defeat a summary judgment motion.  *Id.* at 247–48.

In deciding whether a genuine issue of material fact exists, the court views the evidence and draws all inferences in favor of the nonmoving party.  *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).  However, when a summary judgment motion is made and supported by evidence as provided in Rule 56(c), the nonmoving party may not rest on mere allegations or denials in its pleadings but "must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

As this case is before the court on cross motions for summary judgment with respect to all of Plaintiff's claims, the court evaluates each movant's motion under the

11

requirements of Rule 56 stated above.  WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 at 23-24 (2d ed. 1990) ("The court must rule on each party's motion on an individual basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.").

## IV.    Discussion

As set forth in the introduction, the issues in the parties' motions for summary judgment are threefold:  whether Plaintiff is entitled to statutory penalties from Kindred and MetLife for failing to provide him information he requested, whether Plaintiff is entitled to an annual cost-of-living increase in his monthly benefits, and whether Plaintiff is entitled to attorney's fees.  Each issue is discussed in turn below.

### A.    Penalties against MetLife and Kindred

Section 104(b)(4) of ERISA sets forth:  "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."  ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).  Further, Section 502(c)(1) of ERISA sets forth:

> Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in

12

the amount of up to $100 a day from the date of such failure or refusal, and
the court may in its discretion order such other relief as it deems proper.

ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1).  The maximum penalty was increased to
$110 per day for violations occurring after July 29, 1997.  29 C.F.R. § 2575.502c-1.

### 1.   MetLife

Defendants argue that Section 502(c) of ERISA only authorizes penalties against a
plan administrator, not a claims administrator; thus, MetLife cannot be liable for any
penalties.  However, Plaintiff asserts that MetLife is liable for penalties because, even if
the court determines that MetLife is not the plan administrator, it is an agent of the plan
administrator.

ERISA defines the plan administrator as "the person specifically so designated by
the terms of the instrument under which the plan is operated."  29 U.S.C. §
1002(16)(A)(i).  The Seventh Circuit has made it clear that only the plan administrator is
liable for statutory penalties: "The statute is plain: if a plan administrator is designated in
the plan instrument, that is who has the statutory duty to respond to requests for
information in timely fashion under threat of monetary penalty if he fails to do so."  *Jones
v. UOP*, 16 F.3d 141, 144 (7th Cir. 1994).

In this case, the SPD, which Plaintiff possessed at all times relevant to this
litigation, clearly states that the plan administrator is Kindred but that the claims are
administered by MetLife, and it provides addresses for both.  Under these facts, there is
no basis to find that MetLife is the plan administrator.  Further, as set forth in *Jones*, only

the plan administrator is liable for statutory penalties, not the claims administrator.  As

such, MetLife cannot be liable to Plaintiff for statutory penalties under ERISA.

### 2.    Kindred

Plaintiff also asserts that Kindred is subject to monetary penalties for failing to

respond to his September 21, 2005, request for a copy of the Plan.  While Kindred does

not deny that it failed to provide Plaintiff with a copy of the Plan in a timely manner, it

asserts that Plaintiff did not suffer any prejudice by its failure; thus penalties are not

appropriate.

Courts have looked to a number of factors in deciding whether to assess statutory

penalties under Section 502(c) for failing to provide information requested under Section

104 such as: "bad faith or intentional conduct on the part of the administrator, the length

of the delay, the number of requests made and documents withheld, and the existence of

any prejudice to the participant or beneficiary."  *Jackson v. E.J. Brach Corp.*, 937 F.

Supp. 735, 741 (N.D. Ill. 1996) (quoting *Pagovich v. Moskowitz*, 865 F. Supp. 130, 137

(S.D.N.Y. 1994)).  Whether to assess a penalty and the size thereof is within the

discretion of the district judge.  *Ziaee v. Vest*, 916 F.2d 1204, 1210 (7th Cir. 1990).  The

judge need not consider whether there is a provable injury in exercising his discretion.  *Id*.

The facts in this case weigh in favor of assessing a penalty against Kindred.

Kindred was 196 days delinquent in providing Plaintiff with a copy of the Plan.  Plaintiff

sent a clear request specifying that he was requesting a copy of the Plan, not the SPD,

which Kindred received on September 23, 2005.  Kindred did not provide the requested

14

document until May 10, 2006, after Plaintiff had filed his lawsuit against Defendants for violating ERISA.  Although Plaintiff does not argue that Kindred's delay was in bad faith, Kindred has not provided any reason for its extensive delay.  In addition, Kindred failed to provide a copy of the Plan, the main policy document.

The court finds little merit in Kindred's arguments that Plaintiff was not prejudiced because he has always had a copy of the SPD and he had always received his disability benefits.  Plaintiff requested a copy of the Plan to determine what kind of evidence would suffice as "objective evidence of radiculopathy" since the evidence in his record was apparently insufficient for MetLife to find Plaintiff eligible for the 24-month limitation exception.  Although Plaintiff has received a monthly benefit check since his LTD benefits started in July 2004, that does not indicate Plaintiff has suffered no prejudice. Plaintiff spent over a year disputing his medical condition with MetLife; MetLife repeatedly failed to respond to his requests to reconsider its determination regarding his disability; and only after Plaintiff hired a lawyer did MetLife respond to his appeal and determine that he was eligible to continue receiving disability benefits.  As a policy consideration, the court refuses to find that an insured must wait until his disability benefits stop to appeal the determination in order to make the administrator subject to penalties.  Further, the court notes that existence of a proveable injury is not required to assess a penalty against a plan administrator.

Taking into account the above facts, the court finds that a penalty of $50 per day is appropriate.  Calculation of the penalty shall start on the first day that Kindred was in

15

default, October 24, 2005 (30 days after Kindred received Plaintiff's request), until May 8, 2006, when Kindred's attorney mailed a copy of the Plan to Plaintiff, a total of 196 days.  Thus, the court finds that **KINDRED SHALL PAY** a penalty of **$9800**.  As such, Plaintiff's motion for summary judgment is **GRANTED** and Defendants' motion **DENIED** with respect to Kindred and Plaintiff's motion **DENIED** and Defendants' motion **GRANTED** with respect to MetLife on the issue of penalties.

### B.      Cost-of-Living Increase

The second issue on summary judgment is whether Plaintiff is entitled to a cost-of-living increase in his monthly benefits.  Defendants determined, when it ultimately reviewed Plaintiff's denial of benefits, that the Plan did not provide for a cost-of-living increase.  Plaintiff disputes this result and further argues that the court should review this decision *de novo* because Plaintiff's appeal was "deemed denied" by Defendants' failure to respond to his appeal within 45 days.  Defendants argue that the court may only reverse Defendants' decision if it finds the ruling arbitrary and capricious because the Plan provides that Defendants have discretionary authority to interpret the plan.

### 1.      Standard of Review

A court reviews benefit determinations *de novo*, unless the plan gives the trustees discretionary authority to determine eligibility.  *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1437 (7th Cir. 1996).  If the trustees have discretion, then the court reviews benefit determinations under the arbitrary and capricious standard.  *Id*.  However, when a claim has been "deemed denied" by a plan

administrator's or plan fiduciary's failure to respond to an appeal, the circuits are split on whether to review the denial under the *de novo* or abuse of discretion standard. *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005).

Before deciding which standard of review to use, the court must address whether Plaintiff's claim was "deemed denied." Defendants argue that a deemed denial only occurs in the absence of an administrative decision, and here, MetLife rendered a decision on July 5, 2006. Thus, the court cannot consider Plaintiff's claim "deemed denied." However, a claim is "deemed denied" based on the failure of the administrator to meet certain deadlines set forth in the regulations or in the plan itself. *See* 29 C.F.R. § 2560.503-1(h)(4); *Nichols*, 406 F.3d at 105 (failure to meet regulatory deadlines); *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003) (failure to meet plan deadlines).

In this case, the Plan provides that the claims administrator (MetLife) will respond to an appeal within 45 days, or if additional time is needed, 90 days. However, where additional time is needed MetLife will notify the claimant within the initial 45-day period of the need for the extension. MetLife received Plaintiff's October 30, 2005, appeal on November 3, 2005. Under the terms of the Plan, it should have made its determination by December 18, 2005, or if more time was needed and upon notification to Plaintiff, by March 4, 2005. However, it did not render its decision until July 5, 2006. Thus, Plaintiff's claim was "deemed denied" by December 18, 2005, because MetLife did not respond within the time set forth in the Plan. The fact that Plaintiff allowed MetLife

17

another chance to review his claims once the lawsuit was filed does not change the fact that MefLife failed to respond to Plaintiff's appeal within the Plan's time limits.

Because the court finds that Plaintiff's claim was "deemed denied," the court now turns to the question of what standard it must use to review MetLife's determination that Plaintiff was not entitled to a cost-of-living increase.  The Seventh Circuit has not ruled on this issue.  *See Hawkins v. Prudential Life Ins. Co. of Am.*, No. 1:04-cv-157-JDT-WTL, 2005 WL 4889191, at *10 (S.D. Ind. Aug. 2, 2005) (citing Second Circuit law in finding that a deemed denial is reviewed *de novo*).  The Second, Third, and Tenth Circuits have found that when a claim is "deemed denied," "de novo review applies on the grounds that inaction is not a valid exercise of discretion and leaves the court without any decision or application of expertise to which to defer."  *Nichols*, 406 F.3d at 109 (citing *Gritzer v. CBS, Inc.*, 275 F.3d 291, 295 (3d Cir. 2002) and *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 632–33 (10th Cir. 2003)).[2]

The Fifth Circuit holds that a "deemed denied" claim is always entitled to deferential review, *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993), while the Eighth Circuit reviews such claims *de novo* rather than for abuse of discretion if the review panel's inaction raises "serious doubts about the administrator's decision."  *Seman v. FMC Corp. Ret. Plan for Hourly Employees*, 334 F.3d 728, 733 (8th

---

[2] The *Nichols* court also cited the Ninth Circuit decision in *Jebian v. Hewlett Packard Co.*, 349 F.3d 1098 (9th Cir. 2003) as composing part of the majority.  *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 109 (2d Cir. 2005).  However, as discussed later in this Entry, the Ninth Circuit later narrowed their holding to find that "deemed denied"claims are not always entitled to *de novo* review.  *Gatti v. Reliance Stand. Life Ins. Co.*, 415 F.3d 978, 982–83 (9th Cir. 2005).

Cir. 2003).

The parties rely on Ninth Circuit precedent for their respective positions about
which standard of review the court should exercise.  The Ninth Circuit first held in *Jebian
v. Hewlett Packard Co.* that a "deemed denied" claim is reviewed *de novo*, regardless of
whether the Plan gives the administrator discretion to determine benefit eligibility.  349
F.3d at 1106–07.  However, in *Gatti v. Reliance Standard Life Insurance Co.*, the Ninth
Circuit held, without overruling *Jebian*, that where an administrator has violated the time
limits established in the regulations, making a claim "deemed denied," the standard of
review remains the same as if the administrator had actually denied the claim.  415 F.3d
978, 982 (9th Cir. 2005).  In explaining the seemingly contradictory holdings, the *Gatti*
Court found that the holding in *Jebian* was contingent upon the fact that in that case the
administrator had violated the time limits set forth in the plan, rather than those in the
regulations, even though the time limits were the same.  *Id.*

The court agrees with the majority view set forth in the Second, Third, and Tenth
Circuits to find that *de novo* review is appropriate in this case.  Although the Seventh
Circuit has not ruled on the issue, this court, in its decision in *Hawkins v. Prudential
Insurance Co. of America*, 2005 WL 4889191, at *10, relied in part on the Second
Circuit's ruling in *Nichols*.  Further, the court notes that the Ninth Circuit precedent set
forth in *Jebian* and *Gatti* requires *de novo* review in this case because Plaintiff relies on
the 45-day time limit for determining appeals set forth in the Plan, not the regulations.
Employing *de novo* review, the court now turns to the question of whether Plaintiff is

entitled to a cost-of-living increase in his monthly benefit payments.

### 2.    Review of the Defendants' Denial of a Cost-of-living Increase

Plaintiff disputes Defendants' denial of his cost-of-living increase because the

plain language of the SPD states that the earnings figure used to calculate participants'

benefits is increased for inflation after a participant receives benefits for a year.  Further,

Plaintiff alleges that because the SPD and the Plan conflict, the terms of the SPD should

apply.  Defendants argue that no conflict exists and that the clear language of both the

SPD and the Plan do not allow for a cost-of-living increase.[3]  In setting forth the monthly

benefit calculation, the language of both uses the term "pre-disability earnings," which

does not take into account a cost-of-living increase, rather than "indexed pre-disability

earnings," which does account for such an increase.

In the Seventh Circuit, a two-part framework is used to analyze alleged conflicts

between the SPD and the Plan.[4]  *Hopkins v. Prudential Ins. Co. of Am.*, 432 F. Supp. 2d

745, 758 (N.D. Ill. 2006).  First, the court must determine whether the SPD satisfies

---

[3] The court notes that in its July 5, 2006, denial of Plaintiff's appeal, MetLife states, with respect to its denial of the cost-of-living increase: "Typically, the SPD is the controlling document, but because the SPD and the Certificate of Insurance *appear to conflict* with respect to this Issue, the Certificate of Insurance, the Plan document which provides the funding for the Plan, governs."  (Fact # 37) (emphasis added).  Although the court recognizes that this is not a legal opinion, it casts serious doubt on Defendants' present assertion that the SPD and the Plan do not conflict.

[4] Plaintiff argues that the Plan should be construed in accordance with Sixth Circuit law since the Plan specifies that it is a Kentucky contract.  However, parties may not contract to choose state law to govern an ERISA plan.  *Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998).  Federal common law governs federal questions, *id.*, and the federal law that governs this court is that of the Seventh Circuit.

ERISA's disclosure requirements under 29 U.S.C. § 1022(a), (b).  *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1022 (7th Cir. 1998). ERISA mandates that the SPD "shall be written in a manner calculated to be understood by the average plan participant . . . ."  29 U.S.C. § 1022(a).  The Regulations detail that "[t]he format of the [SPD] must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries."  29 C.F.R. § 2520.102-2(b).  If the SPD does not comply with ERISA's disclosure requirements, then the administrator is estopped from denying coverage for terms not included in the SPD but included in the underlying plan.  *Mers*, 144 F.3d at 1022.

In this case, the SPD does not meet ERISA's disclosure requirements.  Under the subsection entitled "When do LTD benefits start?", the SPD states: "The pre-disability earnings used in calculating your benefit payments will be increased by the annual consumer price index or 7% (whichever is less), starting on the 13th monthly LTD payment and on the anniversary of that payment for each year forward if you continue to be disabled."  (Fact # 11).  That text is paraphrased and in bold font in the left-hand margin of the SPD, acting to highlight that specific portion of the SPD.  Reading the plain language of this text, an average plan participant would understand it to mean that he was entitled to a cost-of-living increase in his benefit payments.  Further, the highlighting of this text acts to increase the chance that a participant reading the SPD will read it and think it important information.  Since Defendants now assert that the Plan does not provide participants receiving LTD benefits with a cost-of-living increase, the SPD is

21

misleading.  As such, Defendants are estopped from relying on the Plan to deny Plaintiff

a cost-of-living increase.

Defendants argue that the inflation-increase language is merely part of the

definition of "indexed pre-disability earnings," used only to define "disability" and the

work incentive program, not to describe the calculation of monthly benefits.  However,

the court finds that this language does not have such a restricted application.  The plain

meaning of the text is that the pre-disability earnings figure used to calculate benefit

payments, and thus the benefit payments themselves, will be increased for inflation after a

year.  Further, reading this text only in conjunction with the meaning of disability or the

work incentive program would be illogical.  The language at issue presupposes that a

participant is disabled—it refers to benefit payments, which a participant only receives if

he is disabled, and states that the pre-disability earnings figure is increased annually "if

you continue to be disabled."  Reading the language under "indexed pre-disability

earnings" in a restrictive way results in circular reasoning and goes against the plain

meaning of the text.  The court may not interpret the terms of the SPD in such a way.  *See*

*Phillips v. Lincoln Nat'l Life Ins. Co.*, 978 F.2d 302, 308 (7th Cir. 1992) (noting that the

court must read the terms of an ERISA-governed policy in an ordinary and popular sense

and not artificially create ambiguity).

However, even if the SPD complied with ERISA's disclosure requirements, the

court finds that Defendants are still estopped from relying on the Plan to deny Plaintiff

benefits.  If the SPD does comply with the disclosure requirements, then the court must

determine if the terms of the SPD and the Plan directly conflict. *Mers*, 144 F.3d at 1022–23. If there is a direct conflict, the administrator is again estopped from relying on terms not in the SPD to deny benefits. *Id*. A direct conflict does not exist simply because the SPD is a clumsy paraphrase of the plan or because the plan explains an issue on which the SPD is silent. *Hopkins*, 432 F. Supp. 2d at 762.

Assuming that the Plan here does not allow for a cost-of-living increase, as Defendants assert, this is a case where the SPD and Plan directly conflict.[5] The SPD clearly states that a participant who has been receiving LTD benefits for a year is entitled to a cost-of-living increase. The Plan does not provide for such an increase. There is no way to reconcile the SPD and the Plan, as they provide opposite answers to the same question. Thus, a direct conflict exists, and Defendants are estopped from relying on the Plan to deny Plaintiff a cost-of-living increase in his monthly benefits.

Based on the above, Plaintiff was entitled to receive a cost-of-living increase in his monthly benefits, as described in the SPD, starting with his July 2005 benefit payment. Plaintiff's motion for summary judgment is **GRANTED** and Defendants' motion **DENIED** on the issue of whether Plaintiff is entitled to a cost-of-living increase in his

---

[5] The court finds it unnecessary to determine whether the language of the Plan denies participants a cost-of-living increase, as Defendants assert. Plaintiff relies on the language of the SPD, while Defendants rely on the language of the Plan. If the court were to determine that the language of the Plan did provide a cost-of-living increase, then Plaintiff would prevail. However, if the court were to determine that the Plan did not provide a cost-of-living increase, the court would still have to conduct a conflict analysis to determine which document governs, since it has already determined that the SPD clearly contemplates a cost-of-living increase. For the sake of argument, the court will assume that the language of the Plan denies such an increase in order to proceed directly with the conflict analysis.

benefit payments.

**C.     Attorney's Fees**

ERISA allows the court, in its discretion, to award reasonable attorney's fees to either party.  29 U.S.C. § 1132(g)(1).  There is a modest, but rebuttable, presumption that prevailing parties are entitled to reasonable attorneys' fees.  *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 592 (7th Cir. 2000).  The Seventh Circuit has articulated two formulas in ERISA actions to determine if a prevailing party is entitled to attorney's fees. *Id*.  The first is a five-factor test, considering: (1) the degree of culpability or bad faith of the offending party; (2) the ability of the offending party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the offending party would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the plan as a whole; (5) and the merits of the parties' positions.  *Id*. at 592–93.  The second test asks whether the losing party's position was substantially justified.  *Id*. at 593.  However, the essential question under either test is the same: "Was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?"  *Id*. (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998)).

The court finds that granting Plaintiff attorney's fees is not warranted in this case under either test.  Under the first test, the court finds that Defendants would be able to satisfy an award of attorney's fees in this case; awarding attorney's fees would deter other plan administrators and claim administrators from failing to respond to participants'

requests for information and review of their claims; and inducing Defendants to timely respond to plan participants would benefit all participants.  However, Kindred's failure to respond to Plaintiff's request for a copy of the Plan and MetLife's failure to respond timely to Plaintiff's appeal alone is insufficient for the court to find that Defendants acted in bad faith.  Further, the court finds that Defendants' position with respect to the cost-of-living increase is not wholly devoid of merit such that the court could find that Defendants were only out to harass Plaintiff.  MetLife's denial of the cost-of-living increase was based upon the language of the Plan, which, as discussed in the analysis above, is in conflict with that of the SPD.  It is not unjustifiable that MetLife would have relied on the Plan, rather than the SPD, when determining Plaintiff's benefits because the SPD is merely a summary of the Plan itself.  As such, the court finds that awarding Plaintiff attorney's fees in this case is not appropriate.

Plaintiff also seeks attorney's fees on the issue of whether he qualified for the 24-month limitation exception.  He argues that because his lawsuit was the catalyst for Defendants awarding him those benefits, he is the prevailing party.  However, as discussed above, the question is not, "Who was the prevailing party?", the question is "Was the offending party's position substantially justified?"  As the 24-month benefit exception issue was resolved at the beginning of the litigation, there is insufficient evidence in the record for the court to properly determine the justifiability of Defendants' position.  Simply because Defendants reversed their initial decision to deny Plaintiff extended benefits does not mean that their initial position was taken in bad faith.  As

such, the court will not award attorney's fees on that issue.

## V.      Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment (Docket # 25) and Defendants' motion for summary judgment (Docket # 28) are both **GRANTED** in part and **DENIED** in part.  Plaintiff is entitled to penalties from Kindred in the amount of $9800 but is not entitled to penalties from MetLife.  Plaintiff is also entitled to a cost-of-living increase in his monthly benefits retroactive from July 2005.  An award of attorney's fees is not warranted in this case.

**SO ORDERED** this 17th day of July 2007.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Andrew  Dutkanych III
BIESECKER & DUTKANYCH LLC
ad@bdlegal.com

Philip John Gutwein II
BAKER & DANIELS
philip.gutwein@bakerd.com

Edward E. Hollis
BAKER & DANIELS
eehollis@bakerd.com

26